Morning. Sorry that we're late. It's my fault. I had a nightmarish experience with San Francisco's one way, no left turn. I ended up way out this way somewhere and it was one of those dreams that you have where you have to take a final exam and you can't find the room. You've all had those, but this one was live. So I apologize. Okay, we'll take up, let's see, Ivanov and Moumnon, well the first is submitted, the second is off calendar. Now we'll take up Adel Ahmad Zaza v. Ashcroft. Good morning, Your Honor. May it please the Court, my name is Amos Lawrence and I represent the petitioners in this case, and in particular Fatima Rouman, whose applications for political asylum withholding removal are the subject of this case. The IJ, or the immigration judge, whose opinion was adopted by the BIA in this case, acknowledged at page 39 of the administrative record that my client was threatened by Muslim extremists because she did not adhere to the strict requirements of the Quran as interpreted by this fundamentalist organization. In accordance with the Board's precedent in matter of essay 22, I and N decision 1528, such threats constitute a cognizable base for relief as threats of persecution on account of the petitioner's religious opinion, provided that they were grave enough. In finding that these threats were not sufficiently grave, and my client did not establish that she was ever in danger from this group, the immigration judge in this case either ignored or disregarded evidence in the record, establishing that petitioner was exposed to threats following the departure of her husband from Jordan in 1999, which included threats to make her pay a price and threats that she would be taught a lesson. After years of harassment and discrimination. She wasn't actually hurt. She wasn't actually abused physically or arrested or anything like that. That is true, Your Honor. Our cases are where we have granted relief or we've held the BIA abusers' discretion in denying relief, we should say, based on threats unaccompanied by anything else, by any physical manifestations, are quite sparse. Usually there is some form of abuse coupled with some threats. It could mean anything from being publicly embarrassed. It could mean your name will be decried in the newspapers as being somebody of ill-appearance. There's all manner of things that could happen. They're not even expressly threats of violence. I'm wondering if you have any authority at all that supports the proposition that threats without anything else, especially threats that aren't even expressly threats of violence, can support a claim that the BIA abuses discretion. Well, I'm relying on Lynn V. INS, Rano V. INS, Reyes-Guerrero V. INS, Senga V. INS, all of which I acknowledge. And I concede your point that frequently these are threats with death. Well, I'm asking, you know, you're relying on a lot of cases, but give me your best case where we've granted relief, we've said the BIA abuses discretion, in a withholding context in particular, where there have been threats unaccompanied by any physical manifestation, no arrest, no beating, no physical harassment. Well, Lynn V. INS acknowledged that threats in conjunction with physical confrontation, even absent harm, is the basis for political asylum. Now, Lynn was not physically confronted until they found he had a well-founded fear based on the threats appearing on a death list. That holding has subsequently been upheld in Reyes-Guerrero, Rano V. INS, and other holdings for the proposition that confrontation in conjunction with threats. But there wasn't even confrontation here, and the threats weren't even threats of death. I acknowledge that, but for instance, in Reyes-Guerrero. And were those withholding cases? I don't know that, Judge. And we're on withholding land here, right? We are. No, not on asylum land. Well, there is an issue on the asylum case. I'm sorry. We should talk about that if you want to, but I assume since you went to the merits, we are now talking withholding. We can talk about your claim about the time in the asylum. Yes, Your Honor. But I assume that your choice is to argue that since we're talking about the merits, this is what the merits are addressed by the BIA. You have a claim that maybe we need to remand for them to consider asylum as well, but that's a different issue. Well, I do. Let me ask you this. Yes, sir. This Muslim Brotherhood, they did threaten Miss Ruman that she would be taught a lesson. Yes. All right? And that her life and freedom would be threatened upon return to Jordan. Am I correct in that? Well, the threat, that is our theory of the case. Now, doesn't this group, the Muslim Brotherhood, teach that you teach women a lesson by throwing acid on them, beating them, and assaulting them with knives? I didn't understand the question, Judge. I'm sorry. Well, what does this group teach? Do they teach that if you're going to teach women a lesson, you do that by throwing acid on them, beating them, and assaulting them with knives? That's apparently inconsistent with my client's experience in Jordan of what she's heard of what's happened to other women in similar circumstances. Did she ever actually? That's apparently what? Consistent? My client has testified that she has heard of other women who have been subjected to that harm on the basis of similar conduct, and that's the basis for her belief that that was the implications of that threat. Did she ever testify explicitly that the individuals who threatened her were from the Muslim Brotherhood? The immigration judge said she did. Let's start with her testimony. Yes. Did she ever testify that the people who threatened her were from the Muslim Brotherhood? I believe she did not say that. And so when the immigration judge says she never referred to that particular group in the course of her testimony, that's consistent with the record? I believe so, Judge. And yet the judge, the immigration judge, acknowledges that he's accepting the fact that that's the Muslim Brotherhood. So I think this Court has sort of found by the IJ's finding that on the basis of his opinion, he made a finding, an assumption, that that was the Muslim Brotherhood, but nevertheless found that it wasn't grave enough to justify a grant of relief. Didn't some of the disapproval, whether it amounted to threats or not, didn't a good deal of the disapproval come from her own family? There was an analogous claim based on that. We didn't advance that theory because I don't think that is a valid claim. Sure. But there's no evidence that her family threatened the kind of harm that S.A. contemplates. I'm about out of time. Can I very briefly address the one-year filing issue? My clients have conceded that she filed more than one year after entry. And she further concedes that this Court lacks jurisdiction to consider a claim that the IJ abused a description in finding that an applicant failed to establish changed circumstances. But, however, this preclusion from review applies only if the agency acted under that section. And in this case, the IJ did not do so. Specifically, he did not consider whether my client's application for asylum was justified on the basis of her husband's previous withdrawal of his application for asylum. Under circumstances analogous. He withdrew his application in September. Of 1997, yes. And her time to file didn't expire until April of 98. Yeah, that is true, Your Honor. So she could have, after he withdrew his application, she had approximately six months where she would have still been timely if she had filed an asylum application after he withdrew his. Provided she was scheduled in an immigration hearing. Can you explain that? According to the regulations, for the immigration judge to accept an application for asylum, he has to give advisements about the consequences of filing a frivolous application. So for the judge to accept the application, it has to be in court. Her next, she did so at her next court. She could have petitioned for a, she could have sought to go into court in the six-month period if she needed to do that. She had the hearing scheduled for the following, I believe it's September 1998. They withdrew their application under the state of the law then, which implied that they could apply for suspension. That was substantially changed by NACARA, I think, in December 1997. You are right that she, probably the best procedure would have been to have asked for an advanced hearing. But nevertheless, we're maintaining that whether that's in a reasonable amount of time doesn't address the issue of whether there were changed circumstances justifying a late application. Whether there's a reasonable amount of time after those changed circumstances is the second issue. But in any event, that would be for the BIA to address on remand, not for this Court to decide whether she did or did not establish these requisite requirements. On what ground did the IJ find her untimely? He found her untimely because it was one year late. We're not contesting that. We're contesting, we're challenging the failure to determine whether, nevertheless, she had extenuating circumstances, changed circumstances which justify the late application. And since the regulations specifically acknowledge situations where applicants age out or become dropped from their, the principal applicant's application because of marriage, our contention is that having your husband withdraw his application and withdraw, therefore, relief from you is analogous to those same situations. And that claim was raised before the IJ and the BIA? The – well, that's not entirely clear. In this case, the BIA rejected the Petitioner's brief, notwithstanding the fact that they asked for it to be accepted one week late due to mailing error. This is unopposed by the district counsel. They rejected that brief and then decided the case four years later. Then was it raised before the IJ? I beg your pardon, Judge? Was it raised before the IJ? Not specifically. They did submit the application for asylum, and the judge ruled that it was one year late and that they would – Well, when you say not specifically, he will – not specifically in the same sense that the IJ didn't specifically rule on it. You're complaining the IJ didn't rule on it, and the question I have is did they make this argument to the IJ? And you say not specifically. I mean, I guess you could say the same thing about the IJ's ruling. He didn't specifically rule on this. That's true. And it looks like he didn't specifically rule on this because your client didn't specifically raise it. Is it therefore before us if not raised before the IJ? Well, good question. I believe that they're obligated to consider that under the statutory scheme. I wish I was there and had raised it, obviously, but I'm sort of stuck with the record in which they didn't do that. I think on some – on an issue as fundamentally important as this, that the BIA wouldn't – the Respondents wouldn't be harmed by having the BIA consider that a remand. If you were to grant Mr. Mann's application withholding, the remaining Petitioners would be deported nevertheless unless there's an opportunity to. I'm sorry. The remaining what? There's no derivative relief for the other Petitioners if you grant Mr. Mann withholding. That's why this is such a crucial issue in this case because the only way the other three Petitioners remain in this country is this. Well, yes. I mean, it's clearly not moot in any sense, even if you grant withholding, because asylum is such more complete relief in a number of ways. Yes. So I'm assuming that both issues are alive. Okay. Thank you. All right. Thank you. Good morning, Your Honors, and may it please the Court. My name is Aviva Poxter for the Government. The instant petition for review should be dismissed, Your Honors, because the lead Petitioner has failed to establish that it's more likely than not that she'll be persecuted for the purposes of qualifying for withholding of deportation. Dismissed? Denied, Your Honor. Dismissed or denied. I thought I picked up the wrong file when you said that. Go ahead. Simply put, nothing happened to her in Jordan for 28 years. She didn't wear a hijab. She didn't attend the mosque. She adhered to her religion as she saw fit, and really nothing happened to her except that she got some dirty looks when she wore pants in the street. That's simply not enough to compel a conclusion that she's entitled to withholding of deportation. She wasn't told she would pay a price? Well, Your Honor, that point is interesting because she didn't actually testify to the you'll pay a price threat. That threat was placed only in her written application. And during her testimony, she never testified to a specific threat. She never said, somebody told me I'm going to pay a price. Is that the written statement part of the record? The written statement is part of the record, Your Honor, but And certainly she testified inconsistently with that. You would point that out. Yes. It's not that she didn't testify inconsistently with it. She didn't testify to it at all. She didn't make any kind of statement of a specific threat. The application is a sworn document, isn't it? I believe in this case it was, Your Honor. Yes. Furthermore, as to this one-year bar to her asylum application And the assumption was that these threats were coming from the Muslim Brotherhood. Yes, the immigration judge made that assumption, although she didn't really testify to having been threatened by a cohesive group. She seemed to describe them as extremists without more. So the immigration judge, I guess, really helped her out by giving the group a name and an identity because she didn't actually testify to who that group was specifically. And, I mean, assuming that it was the Muslim Brotherhood, does this group teach women lessons by throwing acid on them, beating them, and salting them with knives? Well, that seemed to be her belief about this group. There's really nothing in the record, particularly in the country report that was entered, there's nothing in the record that says really anything about this Muslim group and what their particular tenets are. They're not mentioned at all in the country report. No. So the only evidence of record is her description of the group. Exactly. Did the government offer any evidence to counter that? I don't believe so. I think the government probably felt that her testimony was enough to counter it, in a sense, because she didn't really testify to the tenets of the group, the composition of the group, how the group operates, how the group punishes women. There was really nothing there other than these things that she said she had heard about that had happened to other women. But that came into evidence, her statement. Yes. Yeah. Her statements did come into evidence. Can I just disbelieve her description of the group? No, there's no indication that the I.J. disbelieved her. He just didn't think that it rose to the level. He accepted the fact that there were threats, am I right? Yes. And he inferred from her testimony that it came from the Muslim Brotherhood. Yes. And he accepted her description of their past activities.  There is no mention of this group or groups like it in the country report. No, there is not, Your Honor. And, in fact, the country report seems to indicate that women in Germany ---- And I missed one thing. The I.J. found her credible, right? Yes. The I.J. did find her credible, but she didn't meet her burden. We're not contesting her credibility here, but she hasn't testified to anything having happened to her other than threats, which mostly were described as having ---- Did she testify that she witnessed other people being slashed or ---- Her testimony on that issue was unclear. First she said she saw things. Then she said that she heard things. And so it wasn't really clear what she had actually witnessed. She never described in any sort of detail having actually physically seen something like this, as opposed to having heard second-hand or third-hand or whatever about something like this having happened. Did she offer newspaper reports of ---- I don't think that she did, Your Honor. Again, I could check the record to double-check, but I don't remember a newspaper report having been specifically mentioned by anyone during the hearing regarding that issue. Let me ask you this. Can't unfulfilled threats fall within conduct that indicates a danger of future persecution? Well, as was discussed previously, this Court's decisions on this issue are fairly narrow in terms of threats alone not really being enough, unless those threats are so severe that they actually put an alien in fear of their actual life. And that wasn't the case here. She never testified. But threats, unfulfilled threats, certainly are evidence of the support of a person's testimony that they have a future fear of persecution. Threats in some cases probably could be, Your Honor, but in this case where the threats are ---- If somebody came to you and threatened you with some of these things, wouldn't that tell you that you might be assaulted in the future or persecuted in the future? You don't know. To the extent that her ---- the only way that she specified the threats was to say that they were dirty looks, I don't really think so, Your Honor. It's not enough to support a withholding claim. She's got to show that it's more likely than not that she's going to be persecuted. Getting a dirty look on the street doesn't qualify. Well, what about that she'd be taught a lesson? Well, again, to the extent that she even thought that was true or that that actually happens and she didn't testify to it, she didn't specify what that lesson was going to be. I mean, it could have just been she would have been screened that by someone or, you know, gotten a proverbial slap on the wrist or whatever. She didn't say what that lesson was going to be. Well, how does this group teach women a lesson? It's not clear from the record how this group teaches women a lesson, Your Honor. And, again, in terms of the one-year bar to the asylum application, I'd just like to point out that this Court is precluded by statute and by its own case law from reviewing the application of the bar. Section 208A3 of the Immigration and Nationality Act and cases like Molina Estrada basically say that that's a discretionary determination that this Court does not review. But that applies only to the asylum claim, not the withholding claim. That's correct, Your Honor. But in this case, basically what we're saying is that the asylum claim is no longer before this Court. And, in fact, it was never before this Court because the bar was applied and this Court doesn't review that. In addition, it wasn't raised at the time during the hearing. If you look at page 69 of the administrative record, counsel basically said, oh, okay, it's a withholding claim, and went on from there. There was no question of that determination. It wasn't raised before the board, even on the notice of appeal, which, in fact, was filed and did contain argument. The asylum claim was, you know, in effect conceded by her counsel. Yes, exactly. And that's what she, again, is bound by. And this Court can't go back and review the asylum now. The only thing that we're here on, Your Honors, is the withholding. And basically, her entire complaint amounts to the fact that her personal choice not to wear a hijab was not respected to the degree that she wished it to be in Jordan. That complaint doesn't rise to a clear probability of future persecution. Accordingly, and based on the foregoing, the petition for review should be denied. If the Court were to grant this petitioner withholding of deportation, then potentially every woman from a predominantly Muslim country would be entitled to that same relief. And that's certainly not what Congress intended. Thank you. But any rebuttal? May I have 30 seconds, Judge? Yeah. Very briefly. In Respondent's brief and their arguments here, they keep insisting that this is discrimination, dirty looks. But the judge at page 38 and 39 separately acknowledges there were verbal threats. The Respondent's contention is really not a finding of the immigration judge. Ultimately, one would ask the appropriate question is would a reasonable person who has been threatened, who has been harassed for many years and ultimately told that they're going to pay a price and be taught a lesson, would they interpret that to mean they would be persecuted? Well, that's the question we ask on asylum. Here we have to ask whether or not she's established. I mean, she may believe it, but belief is not enough. Belief may be enough in asylum where, you know, the 1 in 10 standard applies. Here she has to come forward with evidence that more likely than not, if we send her back, she's going to suffer persecution. And the fact that she might subjectively believe it or whatever, you know, isn't really the test. Our position, though, is after years and years of getting dirty looks, discriminated, called names, when after her husband left, they said, now we're going to teach you a lesson, you're going to pay a price. Our position is what could that mean other than – Does she identify a specific incident where that happened and who it was with, what were the circumstances? No. Does she say they were – you know, I felt intimidated, I felt I was accosted, they pushed me around, anything like that? Page 94 of the record, she mentions in her testimony for the immigration judge, she says there were verbal threats which scared her.  Thank you, Your Honor. All right, material stand submitted. All right, now we come to Pari versus Ashcroft.
judges: Pregerson, Kozinski, Hawkins